**In Re: DIPPIN' DOTS PATENT LITIGATION**

**No. CIV.A. 1:00CV907TWT.**

United States District Court,
N.D. Georgia,
Atlanta Division.

March 31, 2003.

Christopher Scott Anulewicz, Meadows Ichter & Bowers, Atlanta, GA, for counterdefendant, plaintiff.

Robert R. Baron, Jr., Ballard Spahr Andrews & Ingersoll, Philadelphia, PA, for counterclaimant, defendant.

Michael J. Bowers, Meadows Ichter & Bowers, Atlanta, GA, for counterdefendant, plaintiff.

Lawrence S. Burnat, Schreeder Wheeler & Flint, Atlanta, GA, for counterclaimant, defendant.

Steven Cooper, Anderson Kill & Olick, New York, NY, for counterclaimant, defendant.

David A. Einhorn, Anderson Kill & Olick, New York, NY, for counterclaimant, defendant.

Thomas D. Flanigan, Stockwell Law Offices, Lexington, KY, for plaintiff.

John Philip Fry, Alston & Bird, Atlanta, GA, for counterclaimant, defendant.

Dan Robert Gresham, Thomas Kayden Horstemeyer & Risley, Atlanta, GA, for counterdefendant, plaintiff.

Daniel Healy, Anderson Kill & Olick, New York, NY, for counterclaimant, defendant.

D. Scott Hemingway, Storm & Hemingway, Dallas, TX, for counterdefendant, plaintiff.

Elizabeth R. Kessler, Stockwell & Associates, Lexington, KY, for counterdefendant, plaintiff.

Cynthia Jeannette Lee, Thomas Kayden Horstemeyer & Risley, Atlanta, GA, for counterdefendant, plaintiff.

Benjamin A. Levin, Ballard Spahr Andrews & Ingersoll, Voorhees, NJ, for counterclaimant, defendant.

Daniel Ross McClure, Thomas Kayden Horstemeyer & Risley, Atlanta, GA, for counterdefendant, plaintiff.

Richard S. Morrison, Ballard Spahr Andrews & Ingersoll, Voorhees, NJ, for counterclaimant, defendant.

Frank Garrett Smith, III, Alston & Bird, Atlanta, GA, for counterclaimant, defendant.

Lynn C. Stewart, Schreeder Wheeler & Flint, Atlanta, GA, for counterclaimant, defendant.

Todd E. Stockwell, Stockwell & Associates, Lexington, KY, for counterdefendant, plaintiff.

Julia Carole Thompson, Schreeder Wheeler & Flint, Atlanta, GA, for counterclaimant, defendant.

### ORDER

THRASH, District Judge.

These are related actions brought by the Plaintiffs for patent infringement pursuant to the Patent Act, (35 U.S.C. § 100 *et seq.*), trade dress and trademark infringement pursuant to the Lanham Act, (15 U.S.C. § 1125), alleged violations of the Uniform Trade Secrets Act (18 U.S.C. § 1905), and breach of contract. The Defendants seek a declaratory judgment that the patent in question is invalid and unenforceable. The actions are pending in this Court for consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. They are before this Court on multiple motions for summary judgment filed by all parties. The manufacturers and distributors of a flash frozen ice cream known as Frosty Bites, referred to herein as the Defendants, filed the following motions for summary judgment: (1) Motion for Summary Judgment on Invalidity of U.S. Patent No. 5,126,156 [1:00–CV–907 Doc. No. 245; 1:01–CV–262 Doc. No. 662; 1:01–CV–357 Doc. No. 308; 1:01–CV–202 Doc. No. 185], (2) Motion for Summary Judgment on Non-infringement of U.S. Patent No. 5,126,156 [1:00–CV–907 Doc. No. 246; 1:01–CV–262 Doc. No. 663; 1:01–

CV–357 Doc. No. 309; 1:01–CV–202 Doc. No. 186], (3) Motion for Summary Judgment on Unenforceability of U.S. Patent No. 5,126,156 [1:00–CV–907 Doc. No. 247; 1:01–CV–262 Doc. No. 664; 1:01–CV–357 Doc. No. 310; 1:01–CV–202 Doc. No. 187], (4) Motion for Summary Judgment on Plaintiff's Violation of the Uniform Trade Secrets Act and Breach of Contract Claims [1:00–CV–907 Doc. No. 248; 1:01–CV–262 Doc. No. 665; 1:01–CV–357 Doc. No. 311; 1:01–CV–202 Doc. No. 188]; (5) Motion for Summary Judgment on Plaintiff's Trade Dress Infringement Claims [1:00–CV–907 Doc. No. 249; 1:01–CV–262 Doc. No. 666; 1:01–CV–357 Doc. No. 312; 1:01–CV–202 Doc. No. 189].

Dippin' Dots, Inc. and Curt Jones, referred to herein as the Plaintiffs, filed the following Motions for Summary Judgment: (1) Motion for Summary Judgment of No Antitrust Violation for DDI's Enforcement of Patent Rights, [1:00–CV–907 Doc. No. 250; 1:01–CV–262 Doc. No. 667; 1:01–CV–357 Doc. No. 315; 1:01–CV–202 Doc. No. 190]; (2) Motion for Summary Judgment for Breach of Contract, [1:01–CV–357 Doc. No. 313]; Motion for Summary Judgment of Trademark Infringement and Lanham Act Violations, [1:01–CV–357 Doc. No. 314]. For the reasons set forth below, Defendants' motions are granted in part and denied in part, and Plaintiffs' motions are granted in part and denied in part.

## I. BACKGROUND

This action was filed by Plaintiffs Dippin' Dots, Inc. ("Dippin' Dots"), and its founder, Curt Jones ("Jones"). Dippin' Dots is an Illinois corporation with its principal place of business in Paducah, Kentucky. Dippin' Dots is engaged in the business of manufacturing and distributing flash frozen novelty ice cream. The Defendants in this action are corporations and individuals engaged in either the manufacture or distribution of a competing flash frozen novelty ice cream product known as Frosty Bites.

Jones, the Dippin' Dots founder, applied for and received a patent for the method Dippin' Dots uses to make flash frozen ice cream. (Def.'s Ex. 34, United States Patent No. 5,126,156 ("the '156 patent").) Jones first began working with methods to produce flash frozen novelty ice cream in 1987. (Declaration of Curt Jones, ¶ 2.) In June of 1987 he started keeping notebooks on his progress. (Def.'s Ex. 44 Vol. I at DDI 10005.) These notebooks track Jones' progress with making flash frozen ice cream, business and marketing ideas, as well as contacts for investment and distribution. (Def.'s Ex. 44 Vol. I—IV.)

According to his notebooks, Jones was successful in making a flash frozen ice cream product in June of 1987. The product consisted of frozen beads and nuggets produced by streaming and dripping an ice cream mixture into liquid nitrogen. (Deposition of Curt Jones at 444.) On June 17, 1987, Jones served between fifty and one hundred cups of this product to the public at a picnic sponsored by Alltech, his employer at that time. (*Id.*) Jones did not place any of the people at this company picnic under a confidentiality agreement, and he does not recall ever telling them the product was experimental. (Jones Dep. at 448, 489.)

Later on in July, Jones' work led to an ice cream product consisting of one hundred percent beads of flash frozen ice cream, which were free flowing when served. (*Id.* at DDI 10056–57; Dep. of Curt Jones at 490–504). Jones served his free flowing flash frozen ice cream beads to officials of the Festival Market, a retail development, on July 13, 1987. Jones noted that the officials were potential investors in his product, and that the Festival Market could provide an outlet for selling his new ice cream. (Def.'s Ex. 44 Vol. I at

DDI 10056–57; Jones Dep. at 497–500.) Some of the people at this meeting took samples of Jones' product with them and did not consume the ice cream in Jones' presence. Jones told them to wait ten to fifteen minutes before eating the product. (Jones Dep. at 504–05.) These individuals were not placed under a confidentiality agreement. (Jones Dep. at 497.)

Jones also took his completely beaded product to Rally's, a fast food chain, and to International Desserts. There, Jones allowed people from the establishments to sample his free flowing ice cream beads. (Def.'s Ex. 44 Vol. I at DDI 10137; Jones Dep. at 668–69.) Jones would sometimes leave his product at Rally's for further service after he left. (Jones Dep. at 662.) Jones does not recall placing anyone at Rally's or International Desserts under a confidentiality agreement, and he does not recall informing them that the product was experimental. (Jones Dep. at 669.)

As contemplated, the Festival Market did provide an outlet for Jones' ice cream. Jones sold a flash frozen, free flowing ice cream product there in August and September of 1987. (Jones Dep. at 535–39.) This product differed, however, from what he took to Rally's, International Desserts, and what he originally presented to the officials of the Festival Market. Jones made this product by dripping and streaming his ice cream mixture into liquid nitrogen. (Id. at 536.) This process resulted in a frozen nugget-like ice cream as opposed to a completely beaded product. (Id. at 536, 539.) The product was similar to what he served at the Alltech picnic in June of 1987. Jones gave small samples of his Festival Market product to the public, and then sold the product in larger quantities. (Id. at 558.) Jones considered the Festival Market to be a test-market for the flash frozen ice cream, and he informed his Festival Market patrons accordingly. (Jones Dep. at 547, 552.) No one, however, was placed under a confidentiality agreement. (Id. at 552). Though Jones did not make a profit from his Festival Market sales, he was encouraged by the results. (Id. at 547, 559.)

The freezing agent used in flash freezing ice cream, liquid nitrogen, has a temperature of 320 below zero Fahrenheit. (Jones Dep. at 457.) Jones knew that the flash frozen ice cream was too cold to be consumed right after it was made or removed from the cooler used for transport. If consumed while too cold, the product would burn the mouth of the person eating the ice cream. (Jones Dep. at 501.) Accordingly, Jones advised those to whom he served his product to warm it before consumption. (Def.'s Ex. 44 Vol. I at DDI 10057.) When he served his ice cream at his company picnic in July of 1987, and at the Festival Market in August and September of that year, Jones did not know the specific temperature range to which the ice cream should be warmed. To prevent burning, he simply did not serve the ice cream until it stopped "smoking" or would tell people not to consume it until the "smoking" stopped. (Jones Dep. at 450–51, 485, 549, 555.) Jones believed that at the time the ice cream stopped smoking, it would have been somewhere around 50 below zero Fahrenheit. (Id. at 485.)

Flash freezing food products to make them free flowing was not a novel idea when Curt Jones began using it as a method to produce ice cream. For example, Moustafa M. Aref and Gordon E. Timbers applied for and received a patent for a process wherein they flash froze an alimentary solution of egg product ("Aref Reference"). (Pl.'s Ex. 2 at P0056–P0060, Canadian Patent # 1,376,972.) The Aref reference taught a method for flash freezing an egg substance into free flowing pellets between 3mm and 7mm in diameter. (Id. at P0060.) Other related patents

include the Vitkovsky and Liggett references. The Vitkovsky patent taught a method of flash freezing a food product such that it becomes frangible. (Pl.'s Ex. 3, U.S. Patent # 4,687,672.) Once frozen, Vitkovsky teaches that sending the frangible substance through a fracturing mill results in a frozen free flowing food product. (*Id.*) The Liggett reference teaches that by dripping an alimentary solution into a cryogenic freezing apparatus, one can turn the alimentary solution into frozen spheres. (Pl.'s Ex. 2 at P0035.) The patent examiner considered all three of these references when evaluating Jones' patent application.

Plaintiff Curt Jones first applied for a patent on a method to make flash frozen ice cream on March 6, 1989. (Pl.'s Ex. 1, U.S. Patent No. 5,126,156). The patent was issued on June 30, 1992. (*Id.*) The first claim of the patent contains six steps for making flash frozen free flowing beads of ice cream. The steps include:

[1] preparing an alimentary composition for freezing;

[2] dripping said alimentary composition into a freezing chamber;

[3] freezing said dripping alimentary composition into beads;

[4] storing said beads at a temperature at least as low as –20 F. so as to maintain said beads free-flowing for an extended period of time;

[5] bringing said beads to a temperature between substantially –10 F. and –20 F. prior to serving; and

[6] serving said beads for consumption at a temperature between substantially –10 F. and –20 F. so that beads are free flowing when served.

(*Id.*, Col. 6, 1. 41–57.) It is this patent claim which Plaintiffs contend Defendants infringed.

The '156 patent did not issue as originally filed. In his original patent application,

Jones claimed only five of the six steps listed above, failing to claim the sixth step of serving the ice cream. (*See* Pl.'s Ex. 2 at P0022–P0024.) The patent examiner found that Jones' original claims were obvious in light of the Aref reference, considered with the Liggett and Vitkovsky references. (*Id.* at p. P0032–P0037). The Board of Patent Appeals upheld the finding of obviousness based on the Aref reference alone, because that reference literally satisfied all five of Jones' original claims. (*Id.* at p. P0116–P0117.) Alternatively, the Board of Patent Appeals upheld the determination that Jones' first five claims were obvious considering the Aref reference with the Liggett and Vitkovsky references. (*Id.* at p. P0117–P0119.)

After the Board of Patent Appeals' decision, Jones amended his application to claim an additional step. This additional step was the sixth and taught serving the ice cream while in a free flowing state. (Pl.'s Ex. 2 at P0130–P0132.) The patent examiner again rejected this application, noting that though the previous art did not specifically teach serving ice cream in a free flowing state, to do so was obvious depending on the food product being served. (*Id.* at P0138.) Instead of appealing this decision, Jones filed an affidavit of commercial success to supplement his application for a patent on the six-step process. (*Id.* at P0140–P0165.) In response to this affidavit, the examiner dropped the objections to the patent, and allowed it as presented in its final form above. (*Id.* at P0166.)

Dippin' Dots is the exclusive licensee of the '156 patent for making flash frozen ice cream beads. The ice cream beads are small colorful spheres of ice cream, capable of being poured into a container because of their free flowing characteristic. (Special Master's Report Regarding Claim Construction, *Dippin' Dots, Inc. v. Mosey,*

Civ. Action No. 3:96–CV–1959–X at 49 (N.D.Tex. Feb. 24, 1998)). Dippin' Dots primarily sells its product from colorful kiosks or stands at amusement parks, sporting venues and shopping malls. (Jones Dep. at 78–86.) To identify itself at these locations, Dippin' Dots has a distinctive logo made up of several elements. First, a circle of round spheres of different sizes frames the logo. (Def.'s Motion for Summary Judgment on Trade Dress Infringement Ex. F.) The spheres are blue, yellow and pink. (*Id.*) Through the middle of the circle of spheres runs the product name, "dippin' dots," in blue letters. (*Id.*) The word "dots" falls below and to the right of the word "dippin'." (*Id.*) Below this circle of spheres lies a tag line touting Dippin' Dots as the "Ice Cream of the Future." (*Id.*) On both sides of the tag line lie three spheres, which are also blue, yellow and pink. (*Id.*)

Defendants produce and distribute a flash frozen ice cream product made up of a mixture of beads and irregularly shaped nuggets of ice cream. (Def.'s Ex. 39, 40, 41.) Several steps go into making their ice cream product. A solution is streamed and dripped into liquid nitrogen where it freezes and forms beads and large clusters of frozen ice cream. (*Id.*) The frozen product then passes through a "cluster buster," where the larger clusters are broken down into smaller pieces of ice cream. (*Id.*) After moving through a system of conveyor belts, where the ice cream is further broken down, the beads and small clusters of ice cream are transferred to coolers. (*Id.*) The product stays in the coolers until it is scooped by the gallon and placed into bags for distribution. (*Id.*) The final product that is shipped by Frosty Bites consists of both beads and small irregularly shaped pieces of ice cream. (*Id.*)

Defendants principally sell their ice cream product from booths and kiosks. To identify itself, Frosty Bites has a dis-

tinctive logo which is placed where the product is sold and on the product containers. The logo consists of an ice like background, with the word "Frosty Bites" written on the ice in a blue letters shadowed in pink. (Declaration of Victor Bauer, Ex. 1.) The word "Bites" is centered under the word "Frosty." (*Id.*) The "o" in the word frosty is the torso of a cartoon caricature of a portly penguin, holding a cup of what is intended to be Defendants' product. (*Id.*) The penguin wears a red scarf and a green hat. (*Id.*) The product in the penguin's cup consists of yellow, green, blue and red nuggets of ice cream. (*Id.*) A person dressed like the penguin has appeared at Frosty Bites venues to promote the product. (Bauer Dep. ¶ 6.) Below the words "Frosty Bites" in the logo is a tag line touting Frosty Bites as "The Ultimate Ice Cream Sensation!". (Bauer Dep. Ex. 1.)

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is material if it "might affect the outcome of the suit under the governing law." *Id.* The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–159, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. *Celotex Corp. v.*

*Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 257 (1986).

▆▆▆ "A patent shall be presumed valid." 35 U.S.C. § 282. A party challenging the validity of a patent must establish facts, by clear and convincing evidence, which persuasively lead to the conclusion of invalidity. *Transclean Corp. v. Bridgewood Services, Inc.,* 290 F.3d 1364, 1370 (Fed.Cir.2002). The presumption is a procedural device, which assigns the burden of going forward as well as the burden of proof of facts to the challenger. *Avia Group Intern., Inc. v. L.A. Gear California, Inc.,* 853 F.2d 1557, 1562 (Fed.Cir. 1988). However, the presumption is one of law, not fact, and does not constitute "evidence" to be weighed against a challenger's evidence. *Id.*

### III. DISCUSSION

Both sides in this dispute have filed motions for summary judgment. Defendants seek summary judgment that there was no infringement of Plaintiffs' patent by the Frosty Bites' process, that Plaintiffs' patent is invalid, that Plaintiffs' patent is not enforceable, that there is no trade dress infringement, that there were no violations of the Uniform Trade Secrets Act and that there was no breach of contract. Plaintiffs seek a summary judgment ruling that there was no antitrust violation in their enforcement of patent rights, that there was trade mark infringement and that there was breach of contract. To facilitate discussion, each of these issues is addressed separately below.

### A. Patent Invalidity

Defendants contend that the '156 patent is invalid due to the "on-sale" bar of 35 U.S.C. § 102(b), as well its failure to meet the nonobviousness requirement of 35 U.S.C. § 103. Defendants' argument is that the prior art for the '156 patent should include certain pre-critical date (March 6, 1988) activities of Plaintiff Curt Jones, and that the inclusion of those activities will establish that the method patented in the '156 patent was on-sale prior to the critical date, and that it was obvious under section 103. *See D.L. Auld Co. v. Chroma Graphics Corp.,* 714 F.2d 1144, 1148 (Fed.Cir.1983) (holding sale of product puts method used to make product on sale for purposes of on-sale bar).

As for the section 102 on-sale bar, Plaintiffs contend that their patent is not invalid because Curt Jones' pre-critical date activities did not satisfy all of the claim limitations in the '156 patent. With respect to obviousness, Plaintiffs argue that the prior art should not be enlarged, and that even if it is, secondary evidence of nonobviousness makes the '156 patent valid. For the purposes of this order, the section 102 on-sale bar, and the section 103 nonobviousness requirement are discussed separately below.

#### 1. Nonobviousness Requirement of 35 U.S.C. § 103(a)

▆▆ A patent will not issue if the subject of the patent would be obvious to one who possesses ordinary skill in the art of the invention, at the time the invention was made. 35 U.S.C. § 103(a). Obviousness is a question of law, resolved based upon four underlying factual questions. These underlying factual questions are (1) the scope and content of the prior art; (2) the differences between the prior art and the subject matter of the patent at issue; (3) the level of ordinary skill in the pertinent art; and (4) secondary considerations which bear on the issue of nonobviousness. *B.F. Goodrich Co. v. Aircraft Braking Sys-*

*tems Corp.*, 72 F.3d 1577, 1582 (Fed.Cir. 1996). This Court will discuss each of these factors in turn.

■ There are genuine issues of material fact regarding the scope and content of the prior art, and therefore, summary judgment is not proper. When discussing this question, "scope" refers to the different references which are included in the prior art, while "content" refers to what those references teach. Defendants contend that certain pre-critical date activities of Plaintiff Curt Jones should be included in the scope of the prior art. Specifically, Defendants wish to include evidence that on July 13, 1987, Curt Jones served a frozen, free flowing ice cream product to officials of the Festival Market, that he served a similar product at the Festival Market for a period of 10 days in August and September of 1987, and that he again served a similar product at Rally's and International Desserts on September 1, 1987. Defendants argue that those references make the '156 patent invalid for obviousness. Plaintiffs do not dispute that Jones served a frozen free flowing product before the critical date, but they do challenge whether it is proper to include those activities in the prior art.

■ Plaintiffs allege that the pre-critical date activities of Curt Jones should not be included in the prior art, because they were experimental instead of public uses. The experimental use doctrine allows an inventor "to refine his or her invention or to assess its value relative to the time and expense of prosecuting a patent application." *Baxter Intern., Inc. v. COBE Laboratories Inc.*, 88 F.3d 1054, 1060 (Fed.Cir. 1996). Whether a pre-critical date activity was experimental is determined by the Court as a matter of law, based on several factors. *Petrolite Corp. v. Baker Hughes Inc.*, 96 F.3d 1423, 1426 (Fed.Cir.1996). Among the factors commonly examined are whether testing was reasonably need-ed to demonstrate the efficacy of the invention, whether records were kept of the experimentation, whether testing was systematically performed, the length of the evaluation period in light of the nature of the invention, whether there were secrecy agreements, whether there was compensation paid to the inventor, the control maintained over the putative experiment, and other circumstances bearing on the nature of activities prior to the critical date. *Lough v. Brunswick Corp.*, 86 F.3d 1113, 1120 (Fed.Cir.1996); *Petrolite Corp. v. Baker Hughes Inc.*, 96 F.3d at 1427–28. Viewing the evidence in the light most favorable to Plaintiffs, there are genuine issues of material fact which prevent this Court from saying the pre-critical date activities were not experimental as a matter of law.

■ The notebooks kept by Plaintiff Jones leave genuine issues of material fact as to the primary purpose of his pre-critical date activities. While collecting information on marketing and receiving payment will not automatically make a use public, the primary purpose of the inventor in using his product must be to further the invention's qualities for the use to be experimental. *Omark Industries, Inc. v. Carlton Co.*, 652 F.2d 783, 786 (9th Cir. 1980). Defendants correctly point out that the notebooks contain references to marketing practices, that Jones received payment for his product, that experiments were not systematic, that there were no secrecy agreements, and that the notebooks had no detailed logs of results. However, other pieces of evidence prevent this Court from ruling on experimental use without a trial. Jones' log contains entries which indicate each of the uses Defendants complain about may have been experimental instead of public.

Though they did not contain detailed results of experiments, on multiple occa-

sions Jones' notebooks recorded changes in his production method and how those changes affected the resulting product. (Def.'s Ex. 44 at DDI 10056 (noting use of blue dropper and very cold nature of mix produced perfect spheres of ice cream); DDI 10057 (telling those sampling product to warm in microwave or wait ten to fifteen minutes before consuming); DDI 10137 (noting Flav–o–Rich mix produced "good quality uniform beads"); Jones Dep. at 536–39 (noting Jones dripped and streamed a solution producing a product with some spheres and some irregularly shaped particles of ice cream.)) Each of those recorded alterations and results correspond with the times Defendants claim Jones' use of his method was public. These method alterations and recorded results during pre-critical date uses suggest Jones was conducting experiments on his method, instead of commercially exploiting it prematurely. Viewing the evidence in the light most favorable to Plaintiffs, there are genuine issues of material fact as to the purpose of Jones' pre-critical date activities.

Next, Jones' pre-critical date activities may have led to method changes that are present in the final form of the '156 patent which indicates that the pre-critical date activities were experimental and not public. The Federal Circuit has held that "when an inventor can show changes during experimentation that result in features later claimed in the patent application, this evidence is a strong indication that the activities of the inventor negated any evidence of premature commercial exploitation of an invention ready for patenting." *EZ Dock, Inc. v. Schafer Systems, Inc.*, 276 F.3d 1347, 1353 (Fed.Cir.2002). In *EZ Dock* the inventor sold a floating dock built on rectangular shaped pylons, and then patented a floating dock built on frustoconical shaped pylons. *Id.* The court found the evidence of changes in the invention persuasive on the issue of experimental

use, and vacated a district court ruling that the patent was invalid. *Id.* at 1354. The same type of evidence is present in this case.

The evidence in the instant dispute, viewed in the light most favorable to the Plaintiffs, indicates that during the pre-critical date activities, Jones had not yet developed the long term storage and tempering practices which ultimately found their way into the '156 patent. (Def.'s Ex. 44 at DDI 10057 (noting Jones made ice cream, placed it in a cooler, drove it to allow others to sample, and then told them to warm the product because it was too cold for direct consumption); Jones Dep. at 662 (describing how Jones made ice cream and thereafter delivered it to Rally's and International Desserts for sampling); Jones Dep. at 535–46 (recounting Jones' preparation of a mix of beads and particles of ice cream at the Festival Market and serving it without long term storage as soon as the ice cream stopped smoking.)) In contrast, Jones' patent was much more detailed, teaching specific temperature ranges for long term storage and tempering. Such advances between pre-critical date practices and the ultimate patent are similar to what the Federal Circuit in *EZ Dock* called "strong evidence" of experimental use.

In addition to advances in long term storage and tempering, Jones' pre-critical date activities varied between production of an all spherical product, and one that contained both spheres and irregular shaped pieces of ice cream. (Def.'s Ex. 44 at DDI10057 (discussing use of small blue dropper for making spheres on July 13, 1987); Def.'s Ex. 44 at DDI10137 (discussing dripping of Flav–O–Rich ice cream mixture which made "good quality uniform beads" on September 1, 1987); Jones Dep. at 547–48 (noting Jones used various methods to stream and drip ice cream while at

the Festival Market in August and September of 1987, which made beads and irregularly shaped pieces of ice cream.)) It is noteworthy that the last of the precritical date sales pointed to by the Defendants was a mixed product, and Jones ultimately patented an all beaded product. (*Compare*, Jones Dep. at 547–48 *with* Def.'s Ex. 34, United States Patent No. 5,126,156.) Like the patented advances in long term storage and tempering, this change to an all beaded product is consistent with the "strong evidence" the Federal Circuit relied upon in *EZ Dock*.

■ The experimental use doctrine provides inventors with the opportunity to perfect their invention and be certain it will operate in its intended environment before patenting. *Gould Inc. v. U.S.*, 217 Ct.Cl. 167, 579 F.2d 571, 583 (1978). Accordingly, when uses of a method or product are disputed, continued improvements in the method tend to indicate the uses were experimental, thus justifying the length of the experimental period. Construing the evidence in the light most favorable to the Plaintiffs, that is the result demanded in this case. The fact that the patentor made significant advances after Jones' pre-critical date activities indicates that the length of the experimental period was not so long that the disputed uses should be deemed public by this Court without a trial. While the necessity for the length of time Plaintiffs took to experiment is not clear, viewing all the evidence in the light most favorable to the nonmovant, there is a genuine issue of material fact regarding the issue of experimental use and the scope of prior art.

Finally, this Court recognizes that Jones did not always maintain perfect control over the uses of his product during his pre-critical date activities. Jones would at times allow his product to be sampled and consumed outside of his presence. Further, this Court also recognizes

that control is often referred to as a critical factor in the analysis of whether pre-critical date activities are experimental or public uses. *Petrolite Corp. v. Baker Hughes Inc.*, 96 F.3d 1423, 1428 (Fed.Cir. 1996). On the other hand, the Federal Circuit has indicated it is not necessary to maintain complete control to remain within the experimental use category, and that it is permissible for an intended customer to participate in product testing. *Continental Can Co. U.S.A., Inc. v. Monsanto Co.*, 948 F.2d 1264, 1269 (Fed.Cir.1991) (reversing in part and remanding where issue of fact remained as to whether use was experimental even though potential customer conducted product testing to see if a satisfactory product was produced). The *EZ Dock* case is once again instructive on this point. In that case, the Federal Circuit did not permit control over the experiment to be the pivotal factor, even though the record was void of any reference to control by the inventor during a pre-critical date use. *EZ Dock, Inc. v. Schafer Systems, Inc.*, 276 F.3d 1347, 1353 (Fed.Cir.2002) (Linn, J., concurring). Instead, the Court examined all of the evidence and ordered the case remanded for trial before the issue of experimental use was decided as a matter of law. The instant case is similar. Though Plaintiff Jones did not always maintain perfect control of his product during the disputed uses, other unresolved factors indicate the use may have been experimental. Viewing the evidence in the light most favorable to the nonmovant, these unresolved factors prevent this Court from ruling on experimental use without a trial.

In sum, viewing everything in the light most favorable to the Plaintiff, the evidence of experimentation in Jones' notebooks, the product advances after the disputed uses, and the issues surrounding the length of the testing period prevent this Court from determining whether the pre-

critical date uses were experimental as a matter of law. Because this Court cannot determine whether the disputed uses were experimental or public, there is a genuine issue of fact as to the proper scope of the prior art. Since determining the proper scope of the prior art is one of the factual issues which must be resolved before ruling on obviousness, that issue is not ripe for summary judgment.

The second factor, the differences between the prior art and the subject matter of the patent at issue, cannot be evaluated. As discussed above, there are genuine issues as to the scope of the prior art. Because the scope and content of the prior art cannot be resolved, it is not possible to know what the differences are between the prior art and the patented invention. Thus, because the second factor cannot be assessed, summary judgment on obviousness is not proper.

The third factor in an obviousness analysis, the level of ordinary skill in the pertinent art, is not an issue in this litigation. Plaintiffs and Defendants agree, that the level of ordinary skill in the prior art is one who has a bachelor's degree in basic science, and a "couple years" processing experience in the relevant field. There is thus no genuine issue of material fact on the proper standard for ordinary skill in the pertinent art.

The fourth factor, secondary considerations which bear on the issue of nonobviousness, also contains genuine issues of material fact. Objective evidence of nonobviousness is especially important in the analysis of a patent's validity. The Federal Circuit has said secondary evidence is often the most probative proof on the issue of obviousness, and it can show that an invention thought to be obvious in fact was not at the time of the invention. *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1391 (Fed.Cir. 1988). Nevertheless, in order to be proba-

tive of nonobviousness, the objective evidence must contain a nexus between what it purports to show (i.e., commercial success, long felt need) and the features of the claimed invention. *J.T. Eaton & Co., Inc. v. Atlantic Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed.Cir.1997). Put differently, there must be a link between the objective evidence which shows the invention is not obvious, and the features of that invention. As part of this requirement, the invention's features which establish the nexus cannot be present in the prior art. If the claimed nexus is readily available in the prior art, then the nexus fails and there is no secondary evidence of nonobviousness. *Id.*

In the case at bar, Plaintiff Curt Jones filed a declaration of commercial success and long felt need to serve as secondary evidence of nonobviousness in the prosecution of his patent. Defendants contend that Plaintiffs' alleged nexus between the objective evidence and their product is the serving of a free flowing ice cream product for direct consumption. Defendants contend that serving a free flowing product cannot be a nexus to commercial success or long felt need because it was in the prior art via Jones' pre-critical date activities. As discussed above, viewing the evidence in the light most favorable to the nonmovant, this Court cannot determine as a matter of law that Jones' pre-critical date activities constitute prior art for the '156 patent. Without knowing whether those activities belong in the prior art, this Court also cannot determine whether Plaintiffs can establish a nexus to commercial success with the serving of a free flowing ice cream product. Thus, because there are genuine issues to resolve regarding the nexus between Plaintiffs' objective evidence and the claimed invention, summary judgment is not proper.

Additionally, even if the pre-critical date activities of Plaintiff Jones belong in the

prior art, there is still a genuine issue of material fact for this Court to resolve. Defendants contend the nexus between the commercial success and the '156 patent is the serving step only, while Plaintiffs argue the nexus is the use of the entire method. Plaintiffs correctly point out that the declaration of commercial success does repeatedly refer to the "method" as a whole, and not just the final serving step. (*See* Pl.'s Ex. 2 at P0144 ("product made in accordance with the present method ... invention claimed in the present application produces a product responding to a long felt need ... and has thus achieved significant measurable commercial success"); P0145 ("presently claimed processing method produces a product of unique benefits"); P0146 ("superior characteristics and benefit of the product produced in accordance with the presently claimed method.")) That evidence contrasts with Defendants' argument that Plaintiffs' only nexus was the fact that the ice cream was free flowing when served. Viewing the evidence in the light most favorable to the nonmovant, this conflict leaves a genuine issue of material fact for the Court to resolve. If the putative nexus between the invention and the objective evidence is Plaintiffs' entire method instead of only the serving step, then Plaintiffs' objective evidence should be considered even if Jones' pre-critical date acts of serving ice cream are in the prior art. The combination of elements may be nonobvious, even though the elements themselves are in the prior art. *In re Rouffet*, 149 F.3d 1350, 1357 (Fed.Cir.1998). This issue of fact, combined with the issues of fact surrounding the proper scope of the prior art and the differences in the prior art and the patented invention, makes summary judgment on nonobviousness improper.

**2. On-sale Bar of 35 U.S.C. § 102(b)**

There are genuine issues of material fact regarding whether the subject matter of the '156 patent was "on-sale" prior to March 6, 1988, and therefore, summary judgment on that issue is not proper. Section 102 provides that an individual is entitled to a patent unless "the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application[1] for patent in the United States." 35 U.S.C. § 102(b). Interpreting that statute, the Federal Circuit has held that a patent is invalid for violating the on-sale bar if the subject matter of the patent was fully anticipated or rendered obvious by an offer to sell a product more than one year before the filing of the patent application. *Tec Air, Inc. v. Denso Mfg. Michigan Inc.*, 192 F.3d 1353, 1358 (Fed.Cir.1999). Whether a patent is invalid due to the onsale bar is a matter of law, based on three factual inquiries. *Biodex Corp. v. Loredan Biomedical, Inc.*, 946 F.2d 850 (Fed.Cir. 1991). First, the product which allegedly triggers the on-sale bar must have been the subject of a commercial offer for sale. *Tec Air, Inc. v. Denso Mfg. Michigan Inc.*, 192 F.3d at 1358. Next, assuming there is a commercial offer for sale, "the subject of the barring activity must [meet] each of the limitations of the claim, and thus [be] an embodiment of the claimed invention." *Id.* Finally, if all the limitations of the claim are met, the invention must also have been "ready for patenting." (*Id.*) Put differently, the method must have been "reduced to practice" at the time of the offer for sale. *Id.* If those factual inquiries are resolved, then the

---

**1.** The date one year prior to a patent application is known as the critical date, and in this case that date was March 6, 1988.

Court may decide as a matter of law whether the patent is invalid due to the on-sale bar.

As discussed above, there are genuine issues of material fact as to whether the pre-critical date activities of Plaintiff Jones were experimental or public in nature. Accordingly, there are genuine issues of material fact as to whether Defendants can show a commercial offer for sale, which is required to invalidate a patent under the one year on-sale bar. Nevertheless, even if Defendants had satisfied prong one by showing Plaintiffs offered a product for commercial sale prior to the critical date, Defendants are still not entitled to summary judgment. Genuine issues of material fact exist regarding the other two prongs of the inquiry. As for satisfying each of the claim limitations in the '156 patent, there are genuine issues of material fact as to whether Curt Jones' pre-critical date activities satisfied the limitations on long term storage and tempering prior to consumption. The '156 patent specifically points out that its frozen ice cream product must be capable of being stored for an extended period of time at a specific temperature range, and that the product is to be warmed to a specific temperature range prior to serving. (*See* Def.'s Ex. 34, United States Patent 5,126,156.) Instead of satisfying these claim limitations, the evidence suggests that there was no long term storage of the product Curt Jones produced prior to the critical date, and that Jones would serve the product for direct consumption based on when the ice cream stopped smoking, instead of at a specific temperature range. (*See* Def.'s Ex. 44 at DDI10057 (noting Jones made ice cream on July 13, 1987 and then served it to people with a warning not to eat it until warmed for ten or fifteen minutes); Jones Dep. at 662 (describing how Jones made ice cream and delivered it to Rally's and International Desserts for sampling); Jones Dep. at 535–46 (recounting Jones'

preparation of a mix of beads and particles of ice cream and serving it after the ice cream stopped smoking without any long term storage)). Accordingly, as there are genuine issues of material fact regarding whether Jones' pre-critical date activities satisfied all of the elements in the claims of the '156 patent, summary judgment is improper.

Additionally, regarding the third prong of the on-sale bar inquiry, there are genuine issues of material fact as to whether Jones' method was ready for patenting at the time of the alleged infringing sales. Instead of being reduced to practice, the evidence construed in favor of the Plaintiffs indicates Jones was still experimenting with different methods of producing his ice cream. (Def.'s Ex. 44 at DDI10057 (discussing use of small blue dropper for making spheres on July 13, 1987); Jones Dep. at 547–48 (noting Jones used various methods to stream and drip ice cream while at the Festival Market in August and September of 1987); Def.'s Ex. 44 at DDI10136 (noting use of split bolt droppers which had potential); Def.'s Ex. 44 at DDI10137 (discussing dripping of Flav–O–Rich ice cream mixture which made "good quality uniform beads" on September 1, 1987).) These variations in how the ice cream was made leave genuine issues of material fact as to whether Jones' method was ready for patenting prior to March 6, 1988.

In addition to the variations in making the ice cream, Jones' storage practices indicate he was not yet ready to patent his invention. As for long term storage, Jones appears to have been making his frozen ice cream on an as needed basis. (Def.'s Ex. 44 at DDI 10057 (noting Jones made ice cream, placed it in a cooler and then drove to allow others to sample); Jones Dep. at 662 (describing how Jones made ice cream and delivered it to Rally's and Internation-

al Desserts for sampling without mention of long term storage); Jones Dep. at 535–46 (recounting Jones' preparation of a mix of beads and particles of ice cream at the Festival Market and serving it without long term storage.)) Even if Jones was storing his product for some periods, the evidence construed in favor of the Plaintiffs does not indicate the process of long term storage was "reduced to a practice" as required to effectuate an on-sale bar.

Finally, Jones' ongoing work with tempering his product was not reduced to practice when he served his ice cream before the critical date. Instead of the precise temperature range for service which is in the '156 patent, Jones simply did not serve his product until it stopped smoking. (Jones Dep. at 546.) Alternatively, Jones would sometimes allow the consumer to take the product with only a warning not to consume it before warming it first. (Def.'s Ex. 44 at DDI10057.) Instead of having the process reduced to a practice, the evidence indicates Jones was still developing methods to store and temper his product. As there are genuine issues of material fact on this prong of the on-sale bar analysis, as well as on the commercial offer for sale and satisfaction of claim limitations prongs, summary judgment on the on-sale bar is not proper.

### B. Patent Unenforceability

Defendants contend that the '156 patent is invalid because of the applicant's inequitable conduct before the Patent Office. In order to show that a patent should be unenforceable based on inequitable conduct, Defendants must put forward clear and convincing evidence that there were material nondisclosures to the patent examiner, and that such nondisclosures were made with the intent to mislead the patent examiner in prosecution of the patent. *Halliburton Co. v. Schlumberger Technology Corp.*, 925 F.2d 1435, 1439 (Fed.Cir.1991). These initial steps are

questions of fact. *Id.* After such a showing is made, the court then weighs the materiality and intent of the culpable party, and determines whether there is inequitable conduct to such a level that the patent should be unenforceable. *Id.* Both the factual determinations and the weighing of the factors are issues for the court; there is no jury issue as inequitable conduct is entirely equitable in nature. *General Electro Music Corp. v. Samick Music Corp.*, 19 F.3d 1405, 1408 (Fed.Cir.1994).

In this case, Defendants contend they satisfied the first prong with evidence showing Plaintiffs failed to disclose material references dealing with a previously undisclosed feature of the '156 patent. Defendants contend they satisfied the second prong by showing that Plaintiffs made arguments which could not have been made had disclosure been proper, leading to a finding of intent to deceive. Plaintiffs respond first by arguing that the references about which Defendants complain are not material, and that even if they are, there is no evidence of an intent to mislead. Because there are genuine issues of material fact as to whether Plaintiffs intended to mislead the patent examiner, this issue is not ripe for summary judgment.

As for the first prong, materiality, the non-disclosed activities of Plaintiff Jones appear to be material to the prosecution of the patent, and they should have been disclosed. A reference is material if it discloses features of a patent not disclosed by the prior art. *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1180 (Fed.Cir.1995) (holding reference material where it disclosed something not disclosed in the prior art). In this case, none of the references in the patent prosecution taught service of a free flowing ice cream product. Since Plaintiff Jones' pre-critical date activities taught service of a free flowing ice cream product, they should have been disclosed. Further, the references should have been

disclosed even if it is eventually · determined that the pre-critical date uses were experimental. The Federal Circuit has held that an inventor is required to disclose even experimental uses to a patent examiner. *Manville Sales Corp. v. Paramount Systems, Inc.,* 917 F.2d 544, 551 (Fed.Cir.1990). Accordingly, since the pre-critical date activities taught a feature not disclosed by the other references, they were material and should have been disclosed. The next step is examining the evidence for an intent to mislead the patent examiner.

■ Because there are genuine issues of material fact as to whether Plaintiffs intended to mislead the patent examiner, this case is not ripe for summary judgment. Defendants must put forward affirmative evidence of an intent to mislead, and cannot rely on an inference from the mere failure to disclose material information. *Therma–Tru Corp. v. Peachtree Doors Inc.,* 44 F.3d 988, 996 (Fed.Cir.1995) (noting theory of inferential intent was laid to rest in *Kingsdown Medical Consultants, Ltd. v. Hollister Inc.,* 863 F.2d 867, 876 (Fed.Cir.1988)). To satisfy this burden, Defendants contend Plaintiffs made false assertions of fact, as well as false arguments in their commercial success declaration, which could not have been made had disclosure of Jones' pre-critical date activities been proper. The Federal Circuit has held similar acts to be sufficient to show an intent to mislead. *GFI, Inc. v. Franklin Corp.,* 265 F.3d 1268, 1275 (Fed.Cir.2001). Plaintiffs respond by arguing they made no false assertions, and that the arguments in their commercial success declaration were proper.

Defendants argue that Plaintiffs improperly argued to the patent examiner that none of the cited references taught or suggested the concept of serving a product while maintaining the product in a free flowing state. Additionally, Defendants argue it was not proper for Plaintiffs to contend in an affidavit to the patent examiner that the claimed method was the first to achieve the service of a completely free flowing ice cream product for direct consumption by consumers. Defendants contend that these arguments to the patent examiner were improper because if Plaintiffs had properly disclosed Jones' pre-critical date activities, then those arguments could not have been made. However, previous determinations by this Court weigh heavily on the issue of inequitable conduct. As this Court has already determined, there are genuine issues of material fact as to whether Plaintiff Jones' pre-critical date activities are prior art, for they may have been experimental instead of public uses. If, after the genuine issues of fact are resolved, this Court determines that Jones' pre-critical date uses were experimental, then Plaintiffs' arguments to the patent examiner would be proper, because there would be no prior art teaching those features of his product. On the other hand, if it is shown that the uses were not experimental, then the pre-critical date activities would become prior art references which would make Plaintiffs' arguments to the patent examiner improper. Regardless, this issue cannot be decided until the genuine issues of material fact about Jones' pre-critical date activities are resolved. Summary judgment on inequitable conduct is not proper.

### C. Patent Infringement

Plaintiffs contend that the Frosty Bite Defendants infringe their patent both literally and via the doctrine of equivalents.[2]

---

**2.** This Order addresses infringement only as to the Frosty Bites product. It does not address infringement by the products subject to the preliminary injunction issued by the United States District Court for the Northern District of Texas in *Dippin' Dots, Inc. v. Mosey,* Civ. Action No. 3:96–CV–1959–X.

Because Defendants do not infringe Plaintiffs' patent under either theory, summary judgment for the Defendants is proper.

### 1. *Literal Infringement*

 Defendants do not literally infringe claim one of the '156 patent because there are elements of that claim not found in Defendants' process. In order to prove literal infringement, Plaintiffs must show that Defendants' process reads on the '156 patent exactly. *Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed.Cir.1995). Viewing the evidence in the light most favorable to Plaintiffs, they cannot meet that burden.

 Claim one of the '156 patent describes a method of making ice cream where a solution is dripped into a freezing chamber. (Def.'s Ex. 34, United States Patent No. 5,126,156.) As construed by the Special Master and as adopted by this Court, Defendants do not drip an alimentary solution into a freezing chamber. "Dripping" means "letting fall in drops." (Special Master's Report Regarding Claim Construction, *Dippin' Dots, Inc. v. Mosey*, Civ. Action No. 3:96–CV–1959–X at 19 (N.D.Tex. Feb. 24, 1998)). Defendants do not simply let an ice cream solution "fall in drops." Rather, Defendants' process drips and streams an ice cream solution into the freezing chamber. (Def.'s Ex. 39, Frosty Bites, Inc.'s Video Tape of the Frosty Bites Manufacturing Facility; 40, Dippin' Dots, Inc.'s Video Tape of the Rule 34 Inspection; 41, Frosty Bites, Inc.'s Video Tape of the Rule 34 Inspection.) Thus, Defendants do not literally infringe this limitation on the '156 patent.

Plaintiffs argue that since some drops may form from the streamed solution before reaching the freezing chamber that their patent is infringed. Plaintiffs' expert refers to drops forming, but not to a product which drips from the fill head. (Declaration of L. Steven Young, ¶ 3(a).)

Though a drop may form from a streamed solution, a streamed solution still does not "fall in drops." Rather, a streamed solution falls as a stream toward the freezing chamber; whether drops subsequently form is irrelevant because the solution fell in a stream. Streaming a solution and dripping a solution are two different things. Because Defendants streamed their solution, the dripping limitation of the '156 patent is not literally infringed.

Defendants also do not literally infringe the '156 patent because their process produces a mixture of beads and irregularly shaped flash frozen ice cream. (Def.'s Ex. 38, Photograph Log of the Frosty Bites, Inc. Batches of Ice Cream Manufactured at the Deerfield Beach Facility; 39, Frosty Bites, Inc.'s Video Tape of the Frosty Bites Manufacturing Facility; 40, Dippin' Dots, Inc.'s Video Tape of the Rule 34 Inspection; 41, Frosty Bites, Inc.'s Video Tape of the Rule 34 Inspection.) Claim one of the '156 patent is limited to the making of beads of ice cream. Specifically, the patent refers to freezing an alimentary product into "beads," storing said "beads" so as to keep the "beads" free flowing, bringing the "beads" to a warmer temperature before serving, and serving the "beads" for consumption. (Def.'s Ex. 34, United States Patent No. 5,126,156.) In the Claim Construction Order, the Special Master found that "beads" do not include "irregular or odd shaped particles such as 'popcorn.'" (Special Master's Report Regarding Claim Construction, *Dippin' Dots, Inc. v. Mosey*, Civ. Action No. 3:96–CV–1959–X at 24 (N.D.Tex. Feb. 24, 1998)). Additionally, the Special Master found that the claims of the '156 patent do not cover those processes which produce mixtures of beads and irregular or odd shaped particles. *Id.* Rather, to fall under the '156 patent the process must produce only beads.

Plaintiffs argue that the '156 patent is infringed because it is possible for some servings of Defendants' product to contain only beads. Plaintiffs argue that because the final step in claim one of their patent refers to service, that the whole patent concerns producing serving size portions of their beaded product. This limitation should not be read into the patent. Although the last step in claim one does refer to serving a beaded product, no steps limit the scope of claim one to producing serving-size portions of ice cream. Furthermore, the term serving size is ambiguous, and the Court will not read ambiguity into the clear terms of a patent. Plaintiffs offer various serving size choices for their product, and though Plaintiffs' expert opined as to a proper size (*See* Pl.'s Ex. 29 Declaration of L. Steven Young at 17), claim one itself gives no indication as to which of Plaintiffs' serving sizes might be used for evaluating infringement. Instead of addressing serving sizes, claim one of the '156 patent focuses on a method that begins with the preparation of an "alimentary composition." Neither Dippin' Dots nor Frosty Bites prepares its alimentary compositions in serving size portions. Therefore, to determine whether the product is beaded or a mix of beads and nuggets, the Court should look to the entire production run of alimentary composition. Whether Defendants have produced enough beads to make up a completely beaded serving of some undetermined size is not the proper inquiry. Rather, the inquiry is whether the entire process used by Defendants produces a completely beaded product; only that kind of process can literally infringe claim one of the '156 patent.

Since Defendants' process produces beads and irregularly shaped particles of ice cream, Defendants' method does not literally infringe the '156 patent. Defendants have produced photographs of each batch of ice cream product produced by their method. The photographs were taken as the product came off of Defendants' production line. (Declaration of Peter R. Colelli, ¶ 4.) These photographs represent six hundred and eleven different batches of ice cream made via Defendants' method. (Def.'s Ex. 38, Photograph Log of the Frosty Bites, Inc. Batches of Ice Cream Manufactured at the Deerfield Beach Facility; Index of Pictures in Ex. 38; Colelli Dec. ¶ 4.) Defendants also produced testimony that these photographs were representative of all their product. (Deposition of Victor Bauer at 307–08.) This Court has carefully examined the photographic and video evidence produced by the parties, and in each case, this Court found a mixture of beads and irregularly shaped nuggets in the Frosty Bites product. (Def.'s Ex. 38, Photograph Log of the Frosty Bites, Inc. Batches of Ice Cream Manufactured at the Deerfield Beach Facility; 39, Frosty Bites, Inc.'s Video Tape of the Frosty Bites Manufacturing Facility; 40, Dippin' Dots, Inc.'s Video Tape of the Rule 34 Inspection; 41, Frosty Bites, Inc.'s Video Tape of the Rule 34 Inspection.) Plaintiffs' expert disagreed with that conclusion after examining the photographic evidence, and stated that the photos showed an all beaded infringing product. (Pl.'s Ex. 29 Declaration of L. Steven Young ¶ 16; Pl.'s Brief in Opp. at 23.) However, that opinion was based on the erroneous assumption that the correct measure of product for evaluating infringement was a serving size, which this Court has already rejected. (*Id.* at 17.) Rather, looking at the production represented in the photographs as a whole, each one shows a mixture of beads and irregularly shaped particles. Because this mixture produced by Defendants' method cannot literally infringe claim one of the '156 patent, summary judgment for Defendants is proper.

Plaintiffs also suggest that Defendants' method literally infringes the '156 patent because it can be altered to produce a completely beaded product. Plaintiffs' argument is misplaced. All of the cases cited by Plaintiffs for their alteration argument involve questions of patent infringement in device patents. *See Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, 1343 (Fed.Cir.2001) (computer virus protection software); *Key Pharmaceuticals, Inc. v. Hercon Laboratories Corp.*, 981 F.Supp. 299, 310 (D.Del.1997) (drug in adhesive transdermal patch); *Huck Mfg. Co. v. Textron, Inc.*, 187 U.S.P.Q. 388, 408, 1975 WL 21108 (E.D.Mich.1975) (rivets). Those cases deal with whether a device's non-infringing uses are a defense to patent infringement where the device is reasonably capable of infringing uses. Such precedent is inapplicable where the alleged infringement is on a method claim. Methods of production, unlike devices, are subject to limitless variations because one can simply change how production is carried out. If the ability to alter a method so as to make it infringing was sufficient to show infringement, then any method to produce a product will infringe the patents of similar products. It would not matter that a method does not infringe a patent as actually carried out, because under Plaintiffs view of the law, if the method can be altered to infringe, then there is infringement. The result of such a holding would make countless methods of production highly suspect simply because methods are subject to alterations. Such, however, is not the law. Rather the inquiry is whether Defendants' method, as used, literally infringes the '156 patent. In this connection, the Court notes that if the Defendants were producing significant quantities of all beaded product, that should be capable of easy proof. Defendants do not sell their product in secrecy. Plaintiffs have not come forward with *any* evidence that they have been able to purchase an all

beaded product from a Frosty Bites retailer. The Court is not required to conduct a trial when the Plaintiffs offer *nothing in* support of their claim but hearsay, speculation and conjecture. Therefore, summary judgment is proper.

### 2. Doctrine of Equivalents

 Plaintiffs argue that Defendants' method of making flash frozen ice cream violates the '156 patent under the doctrine of equivalents. To prove infringement under this theory, Plaintiffs must show that each limitation of their claim is substantially present in Defendants' process. *Lemelson v. U.S.*, 752 F.2d 1538, 1551 (Fed.Cir.1985). This is evaluated by a three part inquiry known as the function, way, result test. If Defendants' method performs substantially the same overall function, in substantially the same way, to obtain substantially the same overall result as Plaintiffs' method, then there is infringement under the doctrine of equivalents. *Valmont Industries, Inc. v. Reinke Mfg. Co., Inc.*, 983 F.2d 1039, 1043 (Fed. Cir.1993). However, if the two methods fail to be substantially equivalent in even one of the three elements of the test, then there is no infringement. *Universal Gym Equipment, Inc., v. Atlantic Health & Fitness Products*, 229 U.S.P.Q. 335, 341, 1985 WL 72675 (D.Md.1985), *aff'd in part*, 827 F.2d 1542 (Fed.Cir.1987). Finally, although not as restrictive as proving literal infringement, the doctrine of equivalents will not ignore the structural and functional limitations in a patent. *Sage Products, Inc. v. Devon Industries, Inc.*, 126 F.3d 1420, 1424 (Fed.Cir.1997); *Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1581–82 (Fed.Cir.1996.) As Plaintiffs cannot show Defendants' method infringes the '156 patent under the doctrine of equivalents, summary judgment is proper.

■ Defendants' evidence addressed all three prongs of the function, way, result test. Initially, Defendants pointed out that the two methods at issue in this litigation perform substantially different functions. The '156 patent is repeatedly limited to the *making of beads of flash frozen ice cream.* (*See* Def.'s Ex. 34, United States Patent No. 5,126,156, I claim ("freezing said dripping alimentary composition into beads ... storing said beads ... so as to maintain said beads free flowing ... bringing said beads ... serving said beads ... beads are free flowing when served.")) In contrast, Defendants' method produces flash frozen ice cream beads and irregularly shaped nuggets. (Def.'s Ex. 38, Photograph Log of the Frosty Bites, Inc. Batches of Ice Cream Manufactured at the Deerfield Beach Facility; Def.'s Ex. 39, Frosty Bites, Inc.'s Video Tape of the Frosty Bites Manufacturing Facility; 40, Dippin' Dots, Inc.'s Video Tape of the Rule 34 Inspection; 41, Frosty Bites, Inc.'s Video Tape of the Rule 34 Inspection.) Thus, the functions of the two methods differ substantially, as one functions only to produce beads, while the other serves to produce a mixture of many different shapes of ice cream. (Def.'s Ex. 20, Report of David Reid at 9; Def.'s Ex. 23, Report of Edward Fiorito, at 10.)

■ Even if one were to find that the functions of the two processes were the same, the ways in which they perform that function are different. The second limitation in claim one of the '156 patent establishes that Plaintiffs make their beads of ice cream by dripping an alimentary solution into a freezing chamber. (*See* Def.'s Ex. 34, United States Patent 5,126,156, I claim.) In contrast, Defendants drip and stream an alimentary solution into liquid nitrogen to produce frozen beads and irregularly shaped nuggets of ice cream. (Def.'s Ex. 39, Frosty Bites, Inc.'s Video Tape of the Frosty Bites Manufacturing Facility; 40, Dippin' Dots, Inc.'s Video

Tape of the Rule 34 Inspection; 41, Frosty Bites, Inc.'s Video Tape of the Rule 34 Inspection.) Once Plaintiffs drip their alimentary solution, the beads are formed in the freezing chamber and, after removal, are ready for storage. In contrast, once Defendants stream and drip their solution, they are left with some beads and some irregularly shaped clumps of flash frozen ice cream which, compared to the final product, are quite large. (Def.'s Ex. 39, Frosty Bites, Inc.'s Video Tape of the Frosty Bites Manufacturing Facility; 40, Dippin' Dots, Inc.'s Video Tape of the Rule 34 Inspection; 41, Frosty Bites, Inc.'s Video Tape of the Rule 34 Inspection.) It takes several more steps before Defendants reach a final product. (*Id.*)

These differences are substantial to one knowledgeable in the art of the invention. They are substantial because the way Defendants make their mixture of beads and irregularly shaped particles is not capable of producing a completely beaded product similar to Plaintiffs, and because it requires several additional steps before Defendants can ever arrive at a finished product. (Special Master's Report Regarding Claim Construction, *Dippin' Dots, Inc. v. Mosey,* Civ. Action No. 3:96–CV–1959–X at 24 (N.D.Tex. Feb. 24, 1998)). Moreover, it is also substantial that all other variables being equal, a process which streams and drips an ice cream solution will produce its final product faster and in greater volume when compared to a process which just drips an alimentary solution. (Def.'s Ex. 20, Report of David Reid at 10; Def.'s Ex. 23, Report of Edward Fiorito, at 11.) While Plaintiffs deny this fact, they present no evidence to contradict it. Accordingly, because the two methods go about their functions in different ways, and because the differences are substantial, summary judgment for Defendants is proper.

The two processes at issue in this litigation are also substantially different under the result prong of the function, way, result test. The end product of both methods is flash frozen ice cream. However, Plaintiffs' completely beaded product is substantially different from Defendants' beaded and irregularly shaped popcorn-like nuggets. First, Plaintiffs' completely beaded product is visually distinguishable from Defendants' beaded and irregularly shaped product. (Def.'s Ex. 20, Report of David Reid at 9; Def.'s Ex. 23, Report of Edward Fiorito, at 10; Def.'s Ex. 32, Markman Hearing Transcript at 78–79.) The two products also have a different feel upon consumption, since one is completely round and smooth while the other is irregularly shaped with breakable edges and projections. (Def.'s Ex. 20, Report of David Reid at 9; Def.'s Ex. 23, Report of Edward Fiorito, at 10.) In addition to having a different appearance and feel, the irregular shape of Defendants' ice cream will have an effect on packaging and shipping. Defendants' product is more likely to settle during packaging as its sharp edges and projections can break off into smaller pieces, while Plaintiffs' completely beaded product will not similarly settle. (Def.'s Ex. 20, Report of David Reid at 9–10; Def.'s Ex. 23, Report of Edward Fiorito, at 10; Def.'s Ex. 32, Markman Hearing Transcript at 78–79.) These differences in visual appearance, feel and shipping are substantial, because as Plaintiff Jones indicated, one is not a substitute for the other. (Def.'s Ex. 32, Markman Hearing Transcript at 78–79 (discussing different appearance and packaging qualities of the two ice creams.))

In addition to the above, Defendants' product has different flow characteristics than Plaintiffs' ice cream. (Def.'s Ex. 20, Report of David Reid at 9; Def.'s Ex. 23, Report of Edward Fiorito, at 10). Plaintiffs provided evidence indicating that the flow characteristics of an ice cream product with a beads to non-beads ratio of greater than 70%—30% would be substantially the same as that for a completely beaded product. (Pl.'s Ex. 29, Declaration of L. Steven Young, ¶ 33–37.) Furthermore, Plaintiffs' evidence indicates that if the product has a beads to non-beads ratio of 70%—30% or lower, that flow characteristics would be distinguishable from a completely beaded product. (*Id.* at 28.) While interesting, this evidence is ultimately irrelevant. Plaintiffs did not provide evidence that Defendants ever made ice cream with a beads to non-beads ratio of higher than 70%—30%. Without such proof, Plaintiffs' evidence on flow characteristics does not respond to Defendants showing that the flow characteristics of the two products are different. Such a failure to respond means summary judgment for Defendants is proper.

In addition to the function, way, result analysis, this Court finds that the term "beads" is a meaningful structural limitation on Plaintiffs' patent, and as such it cannot be ignored. Plaintiff Curt Jones did not want to produce a product which consisted of beads and irregularly shaped particles. Jones had produced such in the past, but when filing for his patent, Jones only included beaded pieces of flash frozen ice cream. (Deposition of Curt Jones at 444; Def.'s Ex. 34, United States Patent No. 5,126,156.) Jones believed that irregularly shaped pieces were less attractive than his completely beaded product, and that the irregular pieces would cut down on packaging efficiency. (Def.'s Ex. 32, Markman Hearing Transcript at 78–79.) As noted above, the doctrine of equivalents cannot be used to erase meaningful structural and functional limitations. *Conopco, Inc. v. May Dept. Stores Co.*, 46 F.3d 1556, 32 U.S.P.Q.2d 1225, 1228 (Fed.Cir.1994). The beads-only limitation is a meaningful structural limitation because it was what Jones wanted to patent. After making a

product similar to Defendants', Jones decided not to patent that method, and found it inferior to his all beaded product. Accordingly, since Defendants' product does not read on this meaningful structural limitation, there is no infringement under the doctrine of equivalents.

### D. Trade Dress Infringement

Plaintiffs claim trade dress protection both for their product and for a logo consisting of a brand name inside a circular shape with a tag line underneath. Trade dress protection is available under the Lanham Act, to prohibit the use of "any word, term name, symbol, or device or any combination thereof ... which is likely to cause confusion ... as to the origin, sponsorship, or approval of his or her goods." *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 28–29, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001) (quoting 15 U.S.C. § 1125(a)(1)(A)).In order to qualify for protection, the trade dress cannot be functional. *Id.* at 29, 121 S.Ct. 1255. Once it is determined that the trade dress is not functional, the inquiry may then move on to consider issues of secondary meaning and confusing similarity. *Id.* at 28, 121 S.Ct. 1255; *Epic Metals Corp. v. Souliere*, 99 F.3d 1034, 1038 (11th Cir. 1996). Because Plaintiffs cannot prove an essential element in either trade dress claim, summary judgement for Defendants is proper.

### 1. Product Trade Dress Claim

■ Initially, Plaintiffs . seek trade dress protection for their product. Plaintiffs claim trade dress protection for small round beads or pieces of colorful ice cream. Because this trade dress is functional, it is not entitled to trade dress protection and summary judgment is proper. *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. at 33, 121 S.Ct. 1255. Functionality of product trade dress was the central issue in the *TrafFix* case,

decided by the Supreme Court in 2001. Before addressing the merits in *TrafFix*, the Court acknowledged the limited nature of product trade dress protection when it said, "product design almost invariably serves purposes other than source identification." *Id.* at 29, 121 S.Ct. 1255. From there the Court went on to lay out two tests for functionality, and under both, Plaintiffs' product trade dress is functional.

The first test from *TrafFix* says trade dress is functional if it is "essential to the use or purpose of the article, or if it affects the cost or quality of the article." *Id.* at 32, 121 S.Ct. 1255. Every part of Plaintiffs' alleged product trade dress is functional under this test. First, the colorful nature of Plaintiffs' ice cream is functional because it identifies the flavor of the ice cream served. While Plaintiffs are correct that sometimes color is granted trade dress protection, no cases grant protection for color when it is functional. Even the case Plaintiffs cite makes the distinction between mere color and color which has a function. *Qualitex Co. v. Jacobson Products Co., Inc.* 514 U.S. 159, 165–66, 115 S.Ct. 1300, 131 L.Ed.2d 248 (finding color can meet requirements for trademark when it serves no other function than to distinguish a firm's goods and identify their source). Moreover, the *AmBrit* case, cited by Plaintiffs as "protecting trade dress design of ice cream, including color" does not protect the color of the ice cream, but rather the ice cream's packaging. *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1536–38 (11th Cir.1986). Indeed, the *AmBrit* case could not have protected the color of ice cream as trade dress, for color does more than distinguish goods and identify a source. Ice cream color conveys a message to a consumer by indicating ice cream flavor. Plaintiff Jones indicated this in his deposition by identifying the flavor of banana split ice cream with three

colors of beads. (Jones Dep. at 77.) In this context, ice cream color is functional.

The small size of the beads in Plaintiffs' product is also functional in terms of how it is served, how it is packaged and how it tastes. As for service of Plaintiffs' ice cream, the product is free flowing and is maintained as such through serving, according to the '156 patent. Larger spheres of ice cream would flow differently from Plaintiffs' small beads, thus affecting how the ice cream is served. Such a change in service affects the quality of the ice cream, since the novelty of eating a free flowing product and the speed with which it can be served would be affected by a diminished free flowing nature. Novelty and speed of service were both qualities which Plaintiff Jones stressed to the patent examiner. (Jones Dec. ¶ 4.) Thus, the smallness of Plaintiffs' product is functional because it affects the service qualities of the ice cream.

Altering the size of the individual pieces of Plaintiffs' ice cream will change qualities of the product relating to packaging. Larger pieces of ice cream would result in differing packaging characteristics because there would be more room for air between pieces than with Plaintiffs' small beads. More room for air between the pieces of ice cream means lowered packaging efficiency since more space would be wasted in the bags of ice cream. This in turn means that in order to get the same amount of ice cream when the pieces are larger, a manufacturer would have to provide distributors with more or larger ice cream containers. Providing more or larger containers will affect how the ice cream is shipped, and how much can be shipped at one time. Thus, the small size of the beads in Plaintiffs' ice cream is functional because it has an effect on its packaging and shipping qualities.

Finally, the small size of the beads in Plaintiffs' ice cream affects its quality since it produces a creamier product than conventional ice cream. (*Id.*) This creamier product is the result of less ice crystal formation since the product is flash frozen quickly. (*Id.*) Larger pieces of ice cream would take longer to freeze, thus affecting the quality of the finished product since increased ice crystals would make the product less smooth and creamy. Even Plaintiffs have indicated it was the "tiny dot," and the "small beads" of ice cream which allowed quick freezing and the benefits associated therewith. (Jones Dep. Ex. 1.; Def.'s Ex. 34, Abstract of United States Patent No. 5,126,156.) As both the small pieces and color involved in Plaintiffs' product trade dress are functional, there is no trade dress protection.

■ The second *TrafFix* test says trade dress is functional if the exclusive use of the trade dress would put competitors at a "significant non-reputation based disadvantage." *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. at 32, 121 S.Ct. 1255. Since this Court finds Plaintiffs' trade dress functional under the first test, there is no need to consider the second *TrafFix* inquiry. *Id.* at 33, 121 S.Ct. 1255. Nevertheless, it is clear that under both standards, Plaintiffs' trade dress is functional.

There are several ways that giving Plaintiffs the trade dress protection they seek would result in a non-reputation based disadvantage for competitors. The small dot nature of the flash frozen ice cream results in a creamier product with enhanced serving, packaging and waste reduction qualities. (Jones Dec. ¶ 4.) Preventing competitors from making a product with these qualities would place them at a disadvantage unrelated to reputation. Also, Plaintiffs' assertion that Defendants should market only a clear or all white ice cream is absurd. This Court takes judicial notice that consumer expectations align

certain colors with certain flavors of ice cream. Requiring Defendants to make all their ice cream one color or no color, regardless of flavor, would place them at a significant non-reputation based disadvantage because they would be forced to violate the norms of flavor-color association. Such a disadvantage is also unrelated to reputation. Finally, Plaintiffs' suggestion that Defendants can serve free flowing soft serve ice cream is not an alternative, for as Plaintiffs readily admit, flash frozen ice cream is in a different market from more traditional forms of ice cream. (Jones Dep. at 54–55.) Under both *TrafFix* inquiries, Plaintiffs' product trade dress is functional, and Defendants are entitled to summary judgment.

■■■ Plaintiffs' product trade dress is also functional under the *Morton Norwich* test utilized by the Federal Circuit. The Federal Circuit determined that *TrafFix* does not affect the *Morton–Norwich* analysis it traditionally applies to functionality questions, and that is the standard the Federal Circuit continues to use. *Valu Engineering, Inc. v. Rexnord Corp.*, 278 F.3d 1268, 1276 (Fed.Cir.2002). The four *Morton–Norwich* factors are "(1) the existence of a utility patent disclosing the utilitarian advantages of the design; (2) advertising materials in which the originator of the design touts the design's utilitarian advantages; (3) the availability to competitors of functionally equivalent designs; and (4) facts indicating that the design results in a comparatively simple or cheap method of manufacturing the product." *Id.* at 1274. Analyzing the instant case with these factors does not change the outcome, for Plaintiffs' trade dress is functional under *Morton–Norwich* as well.

First, Plaintiffs' utility patent covers the design of the product, discloses its utilitarian advantage, and is evidence of its functionality. Plaintiffs' utility patent teaches a method for producing small, flash frozen free flowing beads of ice cream. In claim one, the patent discloses the free flowing nature of the product, which as explained above has certain utilitarian advantages in packaging, serving and reducing waste in the ice cream product. More than just the patent, however, are Plaintiffs' representations to the patent examiner which emphasized the benefits of the ice cream mentioned above, as well as the creamier texture of the product. In his Declaration of Commercial Success, Plaintiff Curt Jones emphasized the better taste and texture of his product, how easily and rapidly it was dispensed, the novel way the ice cream was consumed, and the minimal waste produced with his product. (Def.'s Ex. C ¶ 4.) These "superior characteristics and benefits" Jones said, were produced by using the method for which he ultimately received a patent, and are the result of the small pieces of ice cream produced by the method. (*Id.* at ¶ 6.) Thus, the existence of the '156 patent and its prosecution history weigh in favor of finding the product trade dress to be functional under the *Morton–Norwich* analysis.

Second, Plaintiffs produced advertising materials which tout the utilitarian nature of the product design. Plaintiffs produced materials which emphasized how the quick freezing of "tiny round dot[s]" was crucial to the taste and consistency of the product. (Jones Dep. Ex. 1.) This method of freezing "tiny" dots reduced the number of ice crystals in the product producing a smoother and creamier ice cream. (*Id.*) Plaintiffs also promoted the "tiny" size of the ice cream as providing each taste bud the attention it deserves. *Id.* These advertisements emphasizing the benefits of Plaintiffs' product highlight the elements Plaintiffs seek to protect as product trade dress. Thus, the second *Morton–Norwich* factor indicates that Plaintiffs' product trade dress is functional, and is not entitled to protection under the Lanham Act.

Third, at least with regard to the color of the small pieces of ice cream, there is not a functionally equivalent design for competitors to use. Plaintiffs' argument that Defendants could produce a clear or all white ice cream is not an equivalent, because such a product cannot identify ice cream flavor. This Court takes judicial notice that consumer expectations align certain colors with certain flavors of ice cream, such as pink with strawberry and brown with chocolate. While it is presumably possible to produce small pieces of ice cream with no or only one color, such a design would frustrate consumer expectations. Consumers would be led to believe that Defendants produced only one flavor of ice cream. That would not be a "functionally equivalent" design. Thus, the third prong of the *Morton–Norwich* analysis weighs in favor of finding Plaintiffs' product trade dress to be functional.

The fourth factor, whether the design results in a comparatively cheap method of producing the product, appears not to be an issue in this trial. Neither side has produced evidence regarding the economics of flash freezing ice cream. Without such guidance this Court is not able to determine whether Plaintiffs' trade dress is a comparatively cheap method of producing the product, which would make it functional. Accordingly, this prong of the *Morton–Norwich* analysis is not considered.

Though no single *Morton–Norwich* step is dispositive, it is evident that when all three of the *Morton–Norwich* factors at issue in a case indicate that a product trade dress is functional, then the trade dress is not entitled to protection. This is especially the case when Plaintiffs' product trade dress is functional under both *Traf-Fix* inquiries. Plaintiffs may not eliminate competition by claiming trade dress protection for the size and color of their product. Defendants are entitled to summary judgment on Plaintiffs' claims of product trade dress infringement.

### 2. *Logo Trade Dress Claim*

 In addition to product trade dress, Plaintiffs claim trade dress protection for a logo consisting of a product name inside a circular shape with a tag line underneath. To succeed on their claim Plaintiffs must prove two things. First, Plaintiffs must prove that they are entitled to protection because the logo is inherently distinctive or has acquired secondary meaning. Second, Plaintiffs must prove that there is a likelihood of confusion between their protected trade dress, and that used by Defendants. Because Plaintiffs cannot show a likelihood of confusion, Defendants are entitled to summary judgment.

 Assuming, without deciding, that Plaintiffs are entitled to trade dress protection for their logo design, Plaintiffs still cannot show a likelihood of confusion, and accordingly Defendants are entitled to summary judgment. The designs of Plaintiffs' and Defendants' logos are so dissimilar, this Court holds as a matter of law that Plaintiffs cannot prove any likelihood of consumer confusion. Plaintiffs' logo consists of a circular shape made up of round multi-colored spheres with the product name through the middle of the circle. The product name is in blue letters, is in all lower case letters, with the second word "dots" below and offset to the right of the first word "dippin". The tag line at the bottom proclaims "dippin dots" to be "The Ice Cream of the Future," surrounded by more colorful spheres.

The logos of the Plaintiffs and the Defendants are strikingly different. Defendants' logo consists of an icy background with blue letters shadowed in pink. The font used in Defendants' logo is noticeably different from Plaintiffs'. The brand name, "Frosty Bites" is capitalized and

both words are centered on the icy background. The tag line proclaims "Frosty Bites" to be "The Ultimate Ice Cream Sensation." Most importantly, the "o" in "Frosty Bites" is a cartoon of a rotund penguin dressed in red and green, consuming clumps of ice cream intended to be Defendants' product. Plaintiffs argue that early advertisements did not contain a penguin mascot. Nevertheless, the exhibit which Plaintiffs submitted to prove this point, instead confirmed that from the beginning, Defendants utilized a penguin as their product's mascot. (Deposition of Robert Esty, Ex. 31.) These logos are so distinguishable that it is impossible for Plaintiffs to show a likelihood of confusion between them. Accordingly, summary judgment for Defendants is proper.

### E. Violation of the Uniform Trade Secrets Act and Breach of Contract

■ There are no genuine issues of fact regarding violation of the Uniform Trade Secrets Act, ("Uniform Act") and Defendants are entitled to summary judgment. The Uniform Act provides a specific definition for trade secrets, and generally confidential information may not qualify as a trade secret under that definition. *Lovell Farms, Inc. v. Levy*, 641 So.2d 103, 104–05 (Fla.Dist.Ct.App.1994) (using Uniform Act definition to determine what confidential information was protected by Act); *Wright v. Power Indus. Consultants, Inc.*, 234 Ga.App. 833, 508 S.E.2d 191 (1998). In order to prevail on a breach of the Uniform Trade Secrets Act claim, Plaintiffs must present evidence which sat-

isfies a two prong inquiry. First, they must present evidence which indicates that the information they seek to protect qualifies as a protectable trade secret. *Auto Channel, Inc. v. Speedvision Network, LLC*, 144 F.Supp.2d 784, 794 (W.D.Ky. 2001)[3] (citing *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1265 (7th Cir.1992)). To show the information is entitled to protection, Plaintiffs must put forward evidence demonstrating that the information (1) has independent economic value, (2) is not readily ascertainable by proper means, and (3) was the subject of reasonable efforts to maintain its secrecy. *Id.* (citing Kent.Rev. Stat. Ann. § 365.880). If Plaintiffs can meet that burden, they must then show misappropriation by Defendants. *Auto Channel, Inc. v. Speedvision Network, LLC*, 144 F.Supp.2d at 794. To prove misappropriation, Plaintiffs must show that the trade secret was acquired by improper means, was disclosed improperly, or was used by someone without proper consent. Kent.Rev.Stat. Ann. § 365.880. Because Plaintiffs cannot meet their burden under the Uniform Act, summary judgment for Defendants is proper.

■ Plaintiffs did not use reasonable means to protect their putative trade secrets, and thus, the information is not protected by the Uniform Act. Courts interpreting Kentucky law have held that disclosed information must be accompanied by indications it is confidential or trade secret before it is protected by the Uniform Act. *See Auto Channel, Inc. v. Speedvision Network, LLC* 144 ·F.Supp.2d

---

**3.** Defendants appear to dispute the choice of Kentucky law in their Brief in Support of Defendants' Motion for Summary Judgment on the Issues of Violation of the Uniform Trade Secrets Act and Breach of Contract. However, Defendants indicate that the choice of law will not make a difference in the outcome of the case since Kentucky recognizes the decisions of other Uniform Act jurisdictions as persuasive authority for their own version of the Act. Further, in their reply brief, Defendants refer to Kentucky law as the appropriate law for resolving the dispute. Accordingly, this Court will not conduct a conflicts analysis, and will accept Kentucky law as the controlling authority on this issue.

784, 795 (W.D.Ky.2001); *Rogers v. Desa Intern., Inc.*, 183 F.Supp.2d 955, 957 (E.D.Mich.2002). In this case, Plaintiffs made disclosures via various means which they now claim were protected by the Uniform Act. Specifically, Plaintiffs disclosed information via written disclosures, plant "roll-outs" and general unrestricted observance. (*See* Def.'s Ex. F (written disclosures made in conjunction with contracts); Deposition of Robert Esty Jr. at 74–76, 320–327 (discussing "roll out" visit to plant and separate visit as a potential dealer), 347–51 (discussing ability to obtain information about shipping and packaging by observing the loading and unloading of shipping trucks which was visible to the public)). At no time did Plaintiffs indicate to Defendants that the information disclosed was a protected trade secret. Having made these unprotected disclosures, Plaintiffs cannot now complain that Defendants violated their rights under the Uniform Act. Thus, summary judgment is proper.

Additionally, the lack of a confidentiality agreement between the parties obviates Plaintiffs' Uniform Act claims. *Auto Channel, Inc. v. Speedvision Network, LLC*, 144 F.Supp.2d at 796. Between 1994 and 1998, there was no confidentiality agreement between Plaintiffs and Defendants, during which time all of Defendants' putative trade secrets were disclosed. (Def.'s Ex. F, # 's 15–20; Esty Dep. at 321, 327–28.) Plaintiffs inserted a trade secret confidentiality clause in their contract for the first time in 1998, to which Defendants agreed. (Def.'s Ex. F, # 20.) However, a single trade secret clause in the last contract between the parties cannot give Uniform Act protection to those things which were already disclosed openly, without protective warnings, for four years. Further, even after the 1998 contract with the new trade secret clause, nothing was identified as a trade secret so as to make it subject to the clause's protec-

tion. (Def.'s Ex. F, # 20.) In this case, where there was no agreement between the parties, and where any information that was disclosed contained no indication it was trade secret, this Court concludes that Plaintiffs have not taken reasonable measures to secure their allegedly protected information. Such a finding precludes a claim under the Uniform Act, and makes summary judgment for Defendants proper.

Plaintiffs contend that there was an implied duty on Defendants to maintain the secrecy of Plaintiffs' protected information. Although this argument does not remedy Plaintiffs' failure to identify trade secrets in their dealings with Defendants, this Court will analyze the argument as a response to Defendants' assertion that there was no confidentiality agreement between the parties. Because there was no implied duty of confidentiality between Plaintiffs and Defendants, summary judgment is proper.

▮ In another case arising under the Kentucky version of the Uniform Trade Secrets Act, a Federal District Court determined that there was no implied duty on the Defendants to maintain confidences. *See Rogers v. Desa Intern., Inc.*, 183 F.Supp.2d 955 (E.D.Mich.2002). First, the Court noted that the doctrine of an implied duty to maintain confidences comes out of a line of cases which, unlike the instant case, did not arise under the Uniform Act. *Rogers v. Desa Intern., Inc.*, 183 F.Supp.2d at 958; *see also Phillips v. Frey*, 20 F.3d 623, 631 (5th Cir.1994) (analyzing trade secret claim arising out of common law); *Hyde Corp. v. Huffines*, 158 Tex. 566, 314 S.W.2d 763 (1958) (same); *Dotolo v. Schouten*, 426 So.2d 1013, 1015 (Fla.App.1983) (same). The Court noted that there are no cases holding an implied duty to be sufficient to bring a Uniform Act claim. *Rogers v. Desa Intern., Inc.*, 183 F.Supp.2d at 958. This is due to the Uniform Act's statutory focus on whether

a plaintiff used reasonable efforts to protect the confidentiality of its putative trade secrets. Because simple measures, such as identifying materials as trade secret and using a written confidentiality agreement, are available to protect sensitive information, the Uniform Act will not imply a confidential relationship between parties. Accordingly, summary judgment for Defendants is proper.

 Even assuming that an implied duty can arise in a Uniform Act case, there are no facts indicating such a duty was present here. When the relationship between the parties is one of manufacturer and distributor, as in this case, there is no implied duty to maintain confidences, even in common law situations. *Aerospace America, Inc. v. Abatement Technologies, Inc.*, 738 F.Supp. 1061, 1071 (E.D.Mich. 1990) (citing *W.K.T. Distributing Co. v. Sharp Electronics Corp.*, 746 F.2d 1333, 1336–1337 (8th Cir.1984); *C. Pappas Co., Inc. v. E & J Gallo Winery*, 610 F.Supp. 662 (E.D.Cal.1985)). This is especially true when, as in this case, Plaintiffs failed to identify their allegedly protected information to Defendants. *Id.* Because there is no implied duty between the parties to this case, Defendants are entitled to summary judgment.

Plaintiffs' breach of contract claims depend on this Court finding a violation of the Uniform Act. Because this Court has already determined Defendants are entitled to summary judgment on all of Plaintiffs' Uniform Act claims, Plaintiffs' contract claims likewise fail. Accordingly, Defendants are entitled to summary judgment on Plaintiffs' contract claims.

### F. Antitrust Claims

 Plaintiffs move for summary judgment on Defendants' sham litigation antitrust claims. Plaintiffs contend that Defendants pleaded sham litigation because Defendants' counterclaim referred to Plaintiffs' actions as "baseless and unlawful." (Pl.'s Reply Brief on No Antitrust Violation, Ex. 1 ¶ 21.) Defendants, in their response, allege there are no sham litigation antitrust claims, and that they instead pleaded *Walker Process* fraud against Plaintiffs. Assuming, without deciding, that describing charges and conduct as "baseless and unlawful" pleads sham litigation, then Plaintiffs are entitled to summary judgment on any sham litigation claims, since Defendants have abandoned the claim. Additionally, since Plaintiffs did not move for summary judgment on any issues of *Walker Process* fraud, those claims remain for trial.

### G. Breach of Contract for Unpaid Balance by Mr. Esty

Plaintiffs move for summary judgment on their claim that one of the Defendants to this action, Mr. Robert Esty, Jr., owes Plaintiffs a sum of money for delivered goods. Plaintiffs claim that they never received payment for over seventy gallons of their ice cream product, despite delivery to Mr. Esty while he was a Dippin' Dots distributor.. Mr. Esty responds that he owes no money to Plaintiffs because Plaintiffs retained title to the ice cream even after delivery, and that therefore he has received nothing for which he owes a debt.

 The ice cream exchanged between the parties is a good, and is covered by Article II of the U.C.C. Under that Article, reservation of title after delivery amounts only to a security interest, and for all other purposes, title passed to Mr. Esty at the time of delivery by Plaintiffs. *See* Fla. Stat. Ann. ch. 672.401; Ky.Rev.Stat. Ann. § 355.2–401; O.C.G.A. § 11–2–401.[4] The

---

4. For other disputes of state law in these cases, the parties have referred to Kentucky law and Florida law, while for this issue the

parties cite to Georgia law without any explanation as to why Georgia law provides the

reservation of a security interest is a method for sellers to recover goods in case of financial insolvency; it is not a valid excuse for non-payment of delivered goods. Mr. Esty received goods from Plaintiffs for which he owes a debt, and Mr. Esty cannot use Plaintiffs' security interest to avoid that obligation. Accordingly, summary judgment for Plaintiffs is proper. Plaintiffs are entitled to $1,221.48, plus pre and post judgment interest at the prevailing rate.

Plaintiffs originally sought $1,686.11 in this claim, but in replying to Defendants' evidence that some dry goods were returned, they decided to forego $464.63 and pursue only $1,221.48 at this time. (Def.'s Ex. 2.) Plaintiffs wish to pursue the remainder of their claim for $464.63 at trial, but presented no evidence to refute that presented by Defendants showing a return of dry goods. Thus, while Plaintiffs are entitled to $1,221.48 for the delivered ice cream, the remaining $464.63 from their original claim is foreclosed. On that amount, Defendants are entitled to judgment.

■ Though Plaintiffs sought attorney's fees as part of this claim, they have cited no cases, nor have they pointed this Court to any facts in the record which would justify deviating from the traditional rule that each party shoulders its own costs in bringing or defending an action. Accordingly, Plaintiffs are not entitled to attorney's fees on this claim. Plaintiffs are directed to present a proposed judgment with the appropriate prejudgment interest calculations.

### H. Trademark and Lanham Act Violations

■ Plaintiffs also claim Defendant Esty violated their trademark rights, and

Plaintiffs moved for summary judgment on that claim. Because there are genuine issues of material fact regarding this issue, summary judgment is not proper. Both sides agree that Plaintiffs' trademark remained on display at the Hammocks Town Center Mall in Florida for some period of time after the distributorship agreement between Plaintiffs and Defendant Esty ended. (Declaration of Robert Esty ¶ 10, 13.) However, what is not clear is whether the alleged infringing acts were committed by Defendant Esty, or some other entity over whom he had no control. (*Compare* Def.'s Ex. 5; Deposition of Robert Esty, Jr. at 233–235; *with* Esty Declaration, ¶ 10–13.) Because there are genuine issues of material fact as to who committed the alleged infringing acts, summary judgment is not proper.

### CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment on Invalidity of U.S. Patent No. 5,126,156 [1:00–CV–907 Doc. No. 245; 1:01–CV–262 Doc. No. 662; 1:01–CV–357 Doc. No. 308; 1:01–CV–202 Doc. No. 185], is DENIED; Defendants' Motion for Summary Judgment on Non-infringement of U.S. Patent No. 5,126,156 [1:00–CV–907 Doc. No. 246; 1:01–CV–262 Doc. No. 663; 1:01–CV–357 Doc. No. 309; 1:01–CV–202 Doc. No. 186], is GRANTED; Defendants' Motion for Summary Judgment on Unenforceability of U.S. Patent No. 5,126,156 [1:00–CV–907 Doc. No. 247; 1:01–CV–262 Doc. No. 664; 1:01–CV–357 Doc. No. 310; 1:01–CV–202 Doc. No. 187], is DENIED; Defendants' Motion for Summary Judgment on Plaintiff's Violation of the Uniform Trade Secrets Act and Breach of Contract Claims [1:00–CV–907 Doc. No. 248; 1:01–CV–262

---

rule of decision for the case. Nevertheless, any conflict of law issue is false, for the law of

all three states is the same on the subject.

Doc. No. 665; 1:01–CV–357 Doc. No. 311; 1:01–CV–202 Doc. No. 188], is GRANTED; Defendants' Motion for Summary Judgment on Plaintiff's Trade Dress Infringement Claims [1:00–CV–907 Doc. No. 249; 1:01–CV–262 Doc. No. 666; 1:01–CV–357 Doc. No. 312; 1:01–CV–202 Doc. No. 189], is GRANTED; Plaintiffs' Motion for Summary Judgment of No Antitrust Violation for DDI's Enforcement of Patent Rights, [1:00–CV–907 Doc. No. 250; 1:01–CV–262 Doc. No. 667; 1:01–CV–357 Doc. No. 315; 1:01–CV–202 Doc. No. 190], is GRANTED; Plaintiffs' Motion for Summary Judgment for Breach of Contract, [1:01–CV–357 Doc. No. 313], is GRANTED IN PART AND DENIED IN PART; Plaintiffs' Motion for Summary Judgment of Trademark. Infringement and Lanham Act Violations, [1:01–CV–357 Doc. No. 314], is DENIED. Counsel for the parties are directed to contact the Court's courtroom deputy clerk to schedule a status conference regarding further proceedings in this matter.